UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MARGA TAYLOR, as Personal
Representative of the Estate of Earl C.
Hitchcock

                Plaintiff,

-vs-                                Case No.  5:05-cv-397-Oc-10GRJ

ED DEAN, individually and in his official
capacity as Sheriff of Marion County,
Florida; JOHNNY PAPPAS, individually and
in his official capacity as Deputy Sheriff of
Marion County, Florida; MARION COUNTY
SHERIFF'S OFFICE,

                Defendants.
_____

## O R D E R

This 42 U.S.C. § 1983 case concerning the alleged use of excessive force by a law enforcement officer in violation of the Fourth Amendment to the United States Constitution, and related state law claims for battery, wrongful death, and vicarious liability is before the Court for consideration of Defendant Johnny Pappas' Motion for Summary Judgment (Doc. 97) and Defendant Ed Dean's Motion for Summary Judgment (Doc. 98), to which the Plaintiff has responded (Docs. 119 & 121).

In her Amended Complaint (Doc. 24), the Plaintiff purported to state ten causes of action against Johnny Pappas ("Pappas") and Sheriff Ed Dean ("Dean") in both their

individual and official capacities.  The Court granted in part the Defendants' motions to dismiss so that five claims now remain for consideration.

Upon review of the case file and all relevant papers, and for the reasons that follow, the Defendants' motions for summary judgment are due to be granted in part and denied in part.  There exist genuine issues of material fact concerning the Plaintiff's § 1983 claim against Pappas, individually, and the Plaintiff's state law claims against both Pappas, individually, and Dean, in his official capacity as Marion County Sheriff.   However, summary judgment is due to be granted in favor of Dean - in both his individual and official capacities - on the Plaintiff's § 1983 supervisory liability claim, because the undisputed material facts belie the Plaintiff's allegations of a policy of deliberate indifference to the rights of the citizens of Marion County.

### Background and Facts

During the early morning hours of November 13, 2004, Hitchcock, who was under the influence of cocaine, marijuana and alcohol, was driving a pickup truck in Ocala to an unknown destination and, presumably, while on the way, he picked up a man known only as "Vince."  A short time later, he also picked up Krista Fordham, an admitted cocaine user who was walking to a convenience store to purchase cigarettes.  Fordham knew Vince as an acquaintance - but did not know Hitchcock - and accepted an offer of transportation from Vince.  The pickup truck had bucket seats but not an extended cab, and Fordham was seated in the narrow space on the floorboard of the truck behind the

seats, with her back to the passenger-side of the truck and her legs behind the driver, Hitchcock.

Soon after Fordham joined Hitchcock and Vince, Pappas, who was on duty and patrolling the area, observed Hitchcock driving erratically and began following his truck. As a K-9 deputy, Pappas was accompanied by Duke, a German Shepard dog issued to him by the Marion County Sheriff's Office. Hitchcock and Vince immediately became aware that they were being followed, and began speaking nervously. After a short time, Pappas switched on his blue lights and attempted to initiate a traffic stop because he suspected that Hitchcock was driving under the influence of drugs or alcohol. Hitchcock refused to yield and attempted to elude Pappas. During the pursuit, Vince bailed out of the vehicle, and Hitchcock began stuffing plastic baggies into the air-conditioning vents of the truck. Hitchcock told Fordham that he was not going to stop and that he did not have a driver's license. Fordham pled with him to stop and began kicking Hitchcock on his hands, arms, and head in an attempt to stop him. Fordham could not simply exit the vehicle because of her position behind the seats of the truck. Her position also prevented Pappas from seeing Fordham in the truck.

Pappas continued to pursue Hitchcock through a parking lot and down a dead-end street that terminated in a fenced-in electrical substation. On the way into the substation, Fordham felt a jarring impact that she described as the truck jumping a curb. It is not clear how the truck entered the substation. The site was not wholly fenced and was accessible through a gate (that was closed when backup deputies arrived), through an entrance

3

blocked by a chain and a stop sign, and by driving around the posts that hold up that chain.

Inside the substation, Hitchcock struck a tree and exited his vehicle.  In pursuit, Pappas parked his cruiser behind the truck and exited his patrol car.  Pappas ordered that Hitchcock stop, gave K-9 warnings, and released Duke, Pappas himself following close behind.  Duke caught Hitchcock and began biting him.  However, Hitchcock grabbed Duke and began choking the dog.  Soon thereafter, Pappas caught up with Hitchcock and Duke, and pepper-sprayed Hitchcock who was still fighting with Duke.

What happened next is in dispute, and forms the crux of this case.  The testimony of Pappas provides the only account of his confrontation with Hitchcock, who died immediately at the scene.  Although Fordham was there, she could not immediately leave the truck, and when she did extract herself from her position behind the seats and make her way to the scene of the altercation, some 60 yards away from the vehicles, Pappas had already subdued Hitchcock.

According to Pappas, the following transpired: The pepper spray that he used on Hitchcock had no effect but to make him more angry.  Hitchcock let go of the dog, lunged at Pappas, said, "I am going to kill you," picked Pappas up, and slammed him to the ground.  The two began exchanging blows to the head and torso.  Pappas made his way to his feet, but was taken down again by Hitchcock, and the two continued to struggle on the ground.  Pappas again made his way to his feet, and this time he pulled out his

4

portable hand-held radio to call for help.[1]   Hitchcock then lunged for and grasped the handle of Pappas' sidearm, which was in its holster.   Fearing for his life, Pappas used the radio to strike Hitchcock in the head.   Hitchcock continued to fight with Pappas, and took Pappas to the ground a third time.   This time, Pappas was able to subdue Hitchcock.

By contrast, the Plaintiff contends that when Pappas saw Hitchcock trying to kill Duke, Pappas pepper-sprayed Hitchcock and struck him multiple times in the head with a blunt instrument in a effort to subdue Hitchcock and get him to release the dog.   To support this position, the Plaintiff points to the clean and orderly look of Pappas' uniform as depicted in pictures taken immediately after the alleged struggle.   It appears that there was no blood on Pappas' uniform despite his assertion that the two men struggled on the ground on three separate occasions after Hitchcock had suffered scores of puncture wounds from dog bites and fatal head injuries resulting in significant bleeding.[2]   Further, the Plaintiff points to the relative sizes of the alleged combatants: Hitchcock weighed approximately 135 pounds and Pappas weighed approximately 220 pounds.[3]   In addition,

---

[1] This was not Pappas' first radio contact concerning this event.  From the inception of the pursuit Pappas was in radio contact with dispatch.  However, as the incident progressed the meaning of those communications became less obvious.   In dispute is whether initial communications reveal that Pappas was being followed by an unknown deputy, and whether in later communications Pappas was requesting assistance in a struggle with Hitchcock, or was merely requesting medical assistance for Hitchcock.

[2] The Plaintiff's expert in blood spatter analysis casts into doubt Pappas' account of the struggle.

[3] The Plaintiff's experts in toxicology and pathology cast into doubt the Defendants' claims that this size discrepancy was overcome by the cocaine in Hitchcock's system.

although there is clear damage to Pappas' holster in the pictures taken after the incident, Pappas himself testified that he was not aware of when that damage occurred and, moreover, Pappas' equipment was somewhat in disrepair, his magazines rusted into their holders on his utility belt.[4]

While the confrontation between Hitchcock and Pappas transpired, Fordham exited the truck and headed in the direction of a flashlight she saw Pappas drop on the ground during the pursuit. Because it was very dark, Fordham could not immediately see Pappas and Hitchcock. Fordham walked over to and picked up the flashlight. She then spotted Pappas and walked towards him. Fordham approached Pappas, who was kneeling with his knee in Hitchcock's back, from behind. When Pappas saw the light from the flashlight over his shoulder, he expressed that he was thankful that she had arrived and asked for her handcuffs. Surprised at this request, Fordham stated that she didn't have any, but that she could retrieve Pappas' handcuffs - Pappas then realized that Fordham was not a law enforcement officer.[5] Immediately after this exchange, numerous Ocala Police Department, Marion County Sheriff's Office, and emergency medical vehicles arrived at

---

[4] The Plaintiff also has some evidence that another deputy fled the scene prior to the arrival of backup. An event that, according to the Plaintiff, would tend to show that Pappas had used excessive force.

[5] Pappas testified at his deposition that he knew backup had not arrived when he asked Fordham for her handcuffs, but that he also thought Fordham was a law enforcement officer.

the scene.[6]   When Fordham initially saw Hitchcock, he was breathing and moving. Fordham testified that Pappas did not kill Hitchcock.

When additional law enforcement personnel arrived, they handcuffed Hitchcock, who was not then resisting and had the dog's leash wrapped around his neck.   When deputies realized Hitchcock's breathing was shallow, they began performing CPR. However, Hitchcock was pronounced dead at the scene.   Pappas was eventually taken to the Marion County Sheriff's Office, interviewed by FDLE, and placed on administrative leave.   Pappas did not return to full duty.   After about a year he resigned from the Marion County Sheriff's Office pursuant to a worker's compensation settlement agreement related to shoulder injuries that he may have sustained during the altercation with Hitchcock.

## Procedural History

On September 12, 2005, the Plaintiff filed the Complaint in this case and, after receiving leave from the Magistrate Judge, filed her Amended Complaint on May 19, 2006. On May 31, 2006, the Defendants filed motions to dismiss the Amended Complaint, to which the Plaintiff responded.   The Court granted those motions in part, leaving the Plaintiff with half of her original claims, specifying against whom punitive damages were recoverable, specifying what constitutional right was allegedly violated, dismissing the claims against Pappas in his official capacity, and dismissing one of the two original plaintiffs.   Following the Court's Order, the following claims remained:

---

[6] Because the pursuit led down a seldom used dead-end street, personnel from the Ocala Police Department and the Marion County Sheriff's Office had a difficult time locating Pappas.

(a)     Count II - claim for battery against Pappas, individually;

(b)     Count IV - claim for wrongful death against Pappas, individually;

(c)     Count VI - § 1983 claim against Pappas, individually, alleging a violation of decedent Earl C. Hitchcock's Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure and seeking damages, in the alternative, as survivors of the decedent and under Florida's Wrongful Death Statute;

(d)     Count VII - claim for vicarious liability against Dean, as the Sheriff of Marion County, which claim is essentially a claim against Marion County; and

(e)     Count X - § 1983 supervisory liability claim against Dean, individually and in his official capacity as Sheriff of Marion County, alleging a violation of decedent Earl C. Hitchcock's Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure and seeking damages, in the alternative, as survivors of the decedent and under Florida's Wrongful Death Statute; noting that the claim against Dean in his official capacity as the Sheriff of Marion County is essentially a claim against Marion County and that the Plaintiff is seeking punitive damages against Dean individually, and not in his official capacity.

October 25, 2006 Order at 17-18 (Doc. 63).  After extensive discovery, the Defendants filed the motions for summary judgment now under consideration.

## Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."  <u>Samples on Behalf of</u>

Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."  Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. Moreover, conclusory allegations and unwarranted deductions of fact are not accepted as true.  See Eidson v. Arenas, 837 F. Supp. 1158, 1160 (M.D. Fla. 1993).

## Discussion

A.    § 1983 / Deputy Pappas

In Count VI of the Amended Complaint, the Plaintiff has stated a § 1983 claim against Pappas, individually, alleging a violation of Hitchcock's Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure.  Pappas argues that he is entitled to summary judgment because his actions did not constitute a violation of Hitchcock's Fourth Amendment rights and did not violate clearly established law so that he is protected by the doctrine of qualified immunity.

Title 42 U.S.C. § 1983 provides a cause of action against "[e]very person who, under color of any statute . . . of any State. . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the

9

Constitution and laws . . . ."  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  Wyatt v. Cole, 504 U.S. 158, 161 (1992). On the other hand, the purpose of qualified immunity is "to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation."  Lee v. Ferraro, 284 F.3d 1198, 1194 (11th Cir. 2002).  To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Id. (citation and internal quotation marks omitted).  Because it is undisputed that Pappas was acting within the course and scope of his discretionary authority when he arrested Hitchcock, the burden now shifts to the Plaintiff "to show that qualified immunity is not appropriate."  Id.

At the summary judgment stage, the Court must use a two-step process to determine whether the Plaintiff has met her burden.  First, the Court must decide whether the facts alleged, taken in the light most favorable to the Plaintiff, demonstrate that Pappas' conduct violated a constitutional right.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  Assuming the Plaintiff meets this first step, she must then show that the right violated was clearly established.  Saucier, 533 U.S. at 201.  "Clearly established" for purposes of qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Here, the Plaintiff alleges that Hitchcock's Fourth Amendment rights were violated when Pappas used deadly force.  "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  Tennessee v. Garner, 471 U.S. 1, 11-12 (1985).  However, deadly force is not reasonable under the Fourth Amendment "[w]here the suspect poses no immediate threat to the officer and no threat to others."  Garner, 471 U.S. at 11-12.

It is undisputed that Hitchcock was much smaller than Pappas, was unarmed, was attempting to flee, and was struggling with a well-trained attack dog.  It is also undisputed that Pappas used deadly force to subdue Hitchcock by striking him on the head multiple times with a blunt object.  Taking as true the Plaintiff's view of the events that transpired immediately before Pappas delivered those blows - that deadly force was employed not to prevent death or serious bodily harm to the officer, but to subdue Hitchcock and prevent death or serious bodily harm to the dog - the use of deadly force by Pappas violated Hitchcock's constitutional right to be free from excessive force during the seizure of his person.  See Garner, 471 U.S. at 11-12.  Accordingly, a reasonable jury could find that Pappas violated Hitchcock's Fourth and Fourteenth Amendment rights.

Further, qualified immunity is not appropriate because Hitchcock's right to be free from a law enforcement officer's use of deadly force to prevent the escape, on foot, of a non-violent offender is clearly established, as is Hitchcock's right to be free from a law enforcement officer's use of deadly force in defense of the officer's dog.  See Garner, 471

11

U.S. at 11-12.  Indeed, it is axiomatic that while deadly force can be used to prevent death or serious physical harm to oneself and others, such force cannot be employed in the protection of property, which under the law encompasses dogs.  In addition, it should be noted that Pappas does not attempt to challenge this issue of law, but instead makes his argument by taking his own version of the events as undisputed fact and contending that he was justified in using deadly force to protect his own life.  However, the deputy's version of the facts are disputed.  As such, qualified immunity for Pappas is not appropriate and summary judgment is due to be denied on Count VI of the Amended Complaint.

B.    § 1983 / Sheriff Dean

In Count X of the Amended Complaint, the Plaintiff has stated a § 1983 claim against Dean, individually and in his official capacity as Sheriff of Marion County, alleging a violation of Hitchcock's Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure.  To the extent that this claim is against Dean in his official capacity as the Sheriff of Marion County, the claim is essentially an action against Marion County.

"It is well established that a municipality may be held liable under § 1983 only when the deprivation at issue was undertaken pursuant to city 'custom' or 'policy,' and not simply on the basis of respondeat superior."  Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479 (11th Cir. 1991); see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1977) (requiring evidence that the "execution of a government's policy or custom, whether made

by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."). "Thus, recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' - that is, acts which the municipality has officially sanctioned or ordered." Brown, 923 F.2d at 1479. An allegation of a failure to train or supervise can be the basis for liability under § 1983 only where a governmental entity inadequately trains or supervises its employees, this failure to train or supervise is a policy of the entity, and that policy causes the employees to violate a citizen's constitutional rights. See Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989)). Because a governmental entity will rarely have an express policy of inadequately training or supervising its employees, a plaintiff may prove such a policy by showing that the entity's failure to train or supervise evidenced a deliberate indifference to the rights of its citizens. Gold, 151 F.3d at 1350. "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Gold, 151 F.3d at 1350.

It is also "well settled in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jeane, 326 F.3d 1352, 1360-61 (11th Cir. 2003); see McLaughlin v. City of Grange, 662 F.2d 1385, 1388 (11th Cir. 1981), cert. denied 456 U.S.

979 (1982).[7]  Instead, the individual supervisor must have either personally participated in the alleged unconstitutional conduct, or there must exist a causal connection between the actions of the supervisor and the alleged unconstitutional deprivation.  Cottone, 326 F.3d at 1360-61; see Gonzalez v. Reno, 325 F.3d 1228, 1234-35 (11th Cir. 2003).  Here, it is undisputed that Dean did not personally participate in the allegedly unconstitutional conduct, thus, the Court must consider the existence of the causal connection.  The Eleventh Circuit has described three alternate ways in which the necessary causal connection may be established: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so;" (2) "when a supervisor's custom or policy results in deliberate indifference to constitutional rights;" or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."  Cottone, 326 F.3d at 1360 (quoting Gonzalez, 325 F.3d at 1234-35) (internal citations and quotations omitted).  "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."  Cottone, 326 F.3d at 1360.

    To support her claims of supervisory liability against Dean, the Plaintiff has asserted that Dean allowed a group of deputies known as the "Midnight Marauders" to aggressively patrol the County without supervision or fear of discipline.  The Plaintiff has alleged that

---

[7] Dean has failed to raise the issue of qualified immunity on summary judgment.

Dean's lack of supervision over the "Midnight Marauders" resulted in deliberate indifference to citizen rights, which ultimately led to Hitchcock's death through the exercise of excessive force.  The Plaintiff has presented evidence that the "Midnight Marauders" constituted at least some of the deputies assigned to the midnight shift of B Company, and were commanded by Robert Douglas, who purportedly failed to discipline a single deputy he commanded.   Of special concern were two deputies on the midnight shift of B Company.  One deputy caused a civil disturbance by his rude treatment of elderly citizens. The other, a K-9 deputy, had an unusually high incidence of dog bites.

While the death of Earl Hitchcock occurred as a result of events that transpired on November 13, 2004, the Plaintiff has produced evidence concerning events that allegedly took place in 2001 and 2002.  Further, the Plaintiff's evidence is drawn almost entirely from an Ocala Star Banner article that criticizes as overly aggressive the policies of B Company midnight shift commander Robert Douglas, and was published at the height of a contested election between the incumbent Dean and his challenger, Douglas. Regardless of the allegations made by the Plaintiff that parallel the article, the undisputed evidence establishes that, in 2002, Dean transferred the alleged commander of the "Midnight Marauders," Robert Douglas, off of the midnight shift and relieved him of command of  B Company.  Moreover, in 2002, Dean transferred off of the B Company midnight shift two deputies that were explicitly implicated in the article as engaged in

allegedly over-aggressive policing practices.[8]  Subsequent to their transfer, one of those deputies was demoted and resigned, and the other was investigated and cleared of any wrongdoing.[9]

Summary judgment is appropriate here because there is no evidence that Dean knew of a need to train or supervise in a particular area and made a deliberate choice not to take any action.  To the contrary, the evidence establishes that whenever Dean became aware of a potential problem with his deputies he investigated the situation and took corrective action.  Indeed, Dean testified that after he removed Robert Douglas and the two deputies from the B Company midnight shift, he has had no citizen complaints concerning that shift.  Moreover, the Court bases its conclusions not only on the evidence of affirmative corrective action taken regarding the B Company commander and its deputies, but also on extensive evidence concerning the training of Marion County

---

[8] The record reflects that Dean's transfer of these deputies preceded and was wholly unrelated to the article.  The deputies' inclusion in the article is due to their discipline, and not vice versa.

[9] The Plaintiff also points to two more recent incidents to support her claims.  First, the Plaintiff points to an incident in 2004 concerning a deputy that used excessive force during a traffic stop in Belleview, Florida.  However, Dean again took corrective action by demoting the deputy, who promptly resigned.  In addition, the Plaintiff points to an incident in 2004 in which Pappas released K-9 Duke during an arrest, and the suspect was hospitalized due to his resulting injuries.  However, other than the fact the suspect was hospitalized, the Plaintiff points to no evidence of excessive force.  Accordingly, those incidents provide no support for the Plaintiff's supervisory liability claim.

Sheriff's Office deputies,[10] the specialized training required for K-9 deputies,[11] and the continuous oversight and review undertaken by Sheriff Dean, especially with regard to use of force incidents.[12]  In addition, the Plaintiff's own expert testified at his deposition that the Marion County Sheriff's Office operational directives as it relates to complaints against employees, investigation procedures of the internal affairs unit, and use of force operational directives were consistent with customary, professional police practice standards.[13]  In contrast, the Plaintiff has presented no evidence to contradict the evidence that the Sheriff was aware of the issues with B Company and decisively addressed those issues.

In addition, even if the allegations of the Plaintiff as stated in the newspaper article are true, and in 2001 and 2002 there was a failure to train or supervise the B Company midnight shift that amounted to deliberate indifference, there is no evidence that such a "policy" contributed to the alleged deprivation of Hitchcock's constitutional rights two years later and after Dean had taken substantial corrective action.  As such, summary judgment is due to be granted in favor of Dean on Count X of the Amended Complaint.

---

[10] See Affidavit of Lt. Richard Englebright.

[11] See Affidavit of Sgt. Robert Campbell.

[12] See Affidavit of Sheriff Ed Dean.

[13]  Deposition of Michael Cosgrove at 30-31.

C.    Battery

In Count II of the Amended Complaint, the Plaintiff has alleged a state law claim for battery against Pappas, individually.  Pappas argues in his motion for summary judgment that the undisputed material facts reveal that he did not commit a battery and, alternatively, that he is entitled to sovereign immunity.

In Florida, the tort of battery "consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent."  Quilling v. Price, 894 So. 2d 1061, 1063 (Fla. 5th DCA 2005).  However, "a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive."  City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996).  In addition, Florida Statutes section 768.28(9)(a) provides sovereign immunity to law enforcement personnel in carrying out their duties, unless their actions were committed "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  The Florida Supreme Court has reiterated that: "The veil [of sovereign immunity] is lifted only where the employee's act fell outside the scope of employment, in which event sovereign immunity then shields the employee from liability."  McGhee v. Volusia County, 679 So. 2d 729, 733 (Fla. 1996).  The court explained that: "In any given situation, either the agency can be held liable under Florida law, or the employee, but not both."  Id.

18

As explained in the Court's analysis of the § 1983 claim against Pappas, the facts viewed in the light most favorable to the Plaintiff reveal a disputed issue of material fact as to whether the force used in this case was clearly excessive.  Moreover, there exist genuine issues of material fact as to whether Pappas acted in a manner exhibiting wanton and willful disregard for human life when he struck Hitchcock on the head multiple times, causing his death.  The dispute lies in the circumstances proceeding those blows.  And those disputed circumstances are determinative of whether the force used was clearly excessive and whether Pappas is entitled to sovereign immunity.  In Florida, whether a law enforcement officer's "use of force was reasonably necessary is an issue of fact for the jury to determine."  Ansley v. Heinrich, 925 F.2d 1339, 1343 (11th Cir. 1991).  At this stage in the proceedings, it is not the Court's role to weigh the evidence and decide what actually proceeded the deputy's use of deadly force.  As such, summary judgment is due to be denied on Count II of the Amended Complaint.

   D.    <u>Wrongful Death</u>

In Count IV of the Amended Complaint, the Plaintiff has alleged a state law claim for wrongful death against Pappas, individually.  Pappas makes the following, conclusory argument in his motion for summary judgment:

> The Court held that the Plaintiff was permitted to plead a wrongful death claim "in the alternative" because this Court interpreted the wrongful death claim as "containing allegations for recovery of damages pursuant to Florida's Wrongful Death Statute and, in the alternative, for damages that Hitchcock my [sic] have recovered prior to his death." (Doc. 63, page 10)  To that extent, the wrongful death claim in Count IV does not present  any theories of recovery that are different from the theories of

recovery advanced elsewhere in the complaint, and it is thus unnecessary to address the theories of recovery separately herein.

Pappas' Motion for Summary Judgment (Doc. 97) at 20.

Pappas' argument is based on an inaccurate reading of this Court's Order. On the page of the Order cited by Pappas, the Court addressed Count VI (Six) of the Amended Complaint, not Count IV (Four).  In that section of the Order, the Court interpreted Counts VI and X - the § 1983 claims - as containing allegations for recovery of <u>damages</u> pursuant to Florida's Wrongful Death Statute.  However, that section of the Order had nothing to do with Count IV - the state law claim for wrongful death against Pappas.  In fact, the Order does not address Count IV of the Amended Complaint because Pappas did not attack that Count in his motion to dismiss.  Pappas moved to dismiss only Count III, in which the Plaintiff alleged wrongful death against the deputy in his official capacity, and the Court dismissed Count III.[14]  Accordingly, the Court finds unpersuasive Pappas' argument for summary judgment in his favor on Count IV.

In addition, to the extent that Pappas has argued that he is entitled to sovereign immunity on this wrongful death claim, the Court finds that summary judgment is not appropriate for the same reasons articulated regarding the battery claim, as the alleged battery involves the same incident and the same issues of fact as this claim.

---

[14] Although the motion to dismiss contained a section titled, "Defendant, Pappas, Has Immunity Under Florida Law For Claims Asserted In Counts I, III, And IV Of The Amended Complaint," its text did not address Count IV.

20

E.   Vicarious Liability

In Count VII of the Amended Complaint, the Plaintiff has alleged a state law claim for vicarious liability against Dean, in his official capacity as Marion County Sheriff.  Dean argues in his motion for summary judgment that undisputed material facts reveal that Pappas did not commit a battery - hence no vicarious liability - and, alternatively, that the County is entitled to sovereign immunity.

Dean's first argument is unpersuasive because this Court is not granting summary judgment on the battery claim against Pappas.  As to Dean's second argument, sovereign immunity is not applicable here for the same reasons that it is not applicable for Pappas - there exist genuine issues of material fact as to whether Pappas acted in a manner exhibiting wanton and willful disregard for human life.  Again, the Florida Supreme Court has explained that: "In any given situation, either the agency can be held liable under Florida law, or the employee, but not both." McGhee, 679 So. 2d at 733.  In McGhee, an excessive force action was brought against a deputy and sheriff's office and the trial court granted summary judgment for the county on the basis of sovereign immunity, but allowed the action to proceed against the deputy.  Id.  The Florida Supreme Court vacated the grant of summary judgment and remanded the action for trial.  Id.  The court reasoned that:

> Under Swenson [v. Cahoon, 111 Fla. 788, 789, 152 So. 203, 203 (1933)] a jury question as to the sheriff or employing agency's liability exists for acts of officers that can be described as abuses of lawful power.  The employing agency is immune as a matter of law only if the acts are so extreme as to constitute a clearly unlawful usurpation of authority the deputy does not rightfully possess, Swenson, or if there

is not even a pretense of lawful right in the performance of the acts.  <u>Craft v. John Sirounis & Sons, Inc.</u>, 575 So.2d 795 (Fla. 4th DCA 1991).  Here, Deputy Hernlen clearly had the lawful authority to restrain arrestees, detain them, or even respond with force in appropriate situations.  His office gave him that authority, and he therefore cannot be described as a usurper. The fact that Hernlen may have intentionally abused his office does not in itself shield the sheriff from liability.  In sum, the question must be put to the fact-finder whether Deputy Hernlen acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or wilful disregard of human rights, safety, or property.

<u>McGhee</u>, 679 So. 2d at 733.

Similarly, here, there exist genuine issues of material fact as to whether Pappas abused his lawful power to make an arrest.  The jury must weigh the evidence and decide whether Pappas committed no wrongdoing, abused his lawful authority to make an arrest, or acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or wilful disregard of human rights, safety, or property.  Although Pappas and Marion County cannot both be held liable for the battery and wrongful death claims, neither is entitled to summary judgment at this juncture.  Accordingly, the Court finds that summary judgment in Dean's favor is not appropriate on Count VII of the Amended Complaint.

### Conclusion

Accordingly, upon due consideration, it is ordered that:

(1) Defendant Johnny Pappas' Motion for Summary Judgment (Doc. 97) is DENIED;

(2) Defendant Ed Dean's Motion for Summary Judgment (Doc. 98) is GRANTED IN PART AND DENIED IN PART.  Summary judgment is granted in favor of Ed Dean,

individually and in his official capacity as Sheriff of Marion County, and against the Plaintiff on Count X of the Amended Complaint, and DENIED in all other respects; and

(3) the Clerk is directed to enter judgment in favor of Defendant Ed Dean, individually.  The Clerk shall withhold the entry of judgment as to Defendant Ed Dean, in his official capacity as Sheriff of Marion County, and as to Johnny Pappas, individually, pending final resolution of this case.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 17th day of May, 2007.

_____
UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record